# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF ILLINOIS

* * * * *

| | |
|---|---|
| GERALD CHARLESTON,          )<br>                               )<br>        Plaintiff,      )<br>                               )<br>    v.                      ) | Case No.: 1:12-cv-9463 |

GERALD CHARLESTON,         )

        Plaintiff,      )      Case No.: 1:12-cv-9463

    v.                )

BOARD OF TRUSTEES OF THE UNIVERSITY )
OF ILLINOIS AT CHICAGO; JAMES W. HALL, )
individually and in his official capacity as )
Associate Dean for Student Affairs; PAULA )
ALLEN-MEARES, individually and in her )
official capacity as Chancellor of the University of )
Illinois at Chicago; RALPH KEHL, individually )
and in his official capacity as Head of Obstetrics )
and Gynecology Dept.; NANCY WOZNIAK, )
individually and as Associate Dept. Head of the )
Obstetrics and Gynecology Dept.; and )
DOES I-XX, inclusive, )
                          )
        Defendants.     )

## OPPOSITION TO DEFENDANTS' 12(b)(6) MOTION TO DISMISS PLAINTIFF'S COMPLAINT AND MEMORANDUM IN SUPPORT THEREOF

COMES NOW, Plaintiff, GERALD CHARLESTON, by and through his counsel, Jason J. Bach and Blake Horwitz, hereby submits the following Opposition to Defendants' Motion to Dismiss Plaintiff, Gerald Charleston's Complaint:

## I.

## STATEMENT OF FACTS

In January, 2011, Plaintiff exhausted his administrative appeals and was dismissed from the UIC College of Medicine for "unprofessional" conduct as a result of a complaint that was filed against him by a preceptor in September 2010, following his Obstetrics and Gynecology clinical rotation. At that time, Plaintiff was a fourth year medical student in the College of Medicine during the academic year 2009-2010. *Complaint para. 16.* Plaintiff actually completed his Obstetrics and Gynecology rotation in June 2010 without incident and without any mention from the University that he exhibited unprofessional conduct. *Id., para. 17.*

On or about September 12, 2010, two of Plaintiff's preceptors for his OB/GYN rotation, Drs. Kehl and Wozniak, submitted a complaint to the College of Medicine alleging Plaintiff committed errors on his written work for the rotation, including plagiarism in his patient history and physical reporting, that he did not complete his written quizzes until one week after the rotation, that his case log did not have physician signatures, that he spent four weeks of the rotation without a preceptor, and that he did not perform well enough on the rotation to pass the rotation. The complaint stated that Plaintiff should be required to repeat the OB/GYN rotation. *Id., para. 18*. The complaint submitted by Drs. Kehl and Wozniak was immediately forwarded to the Urbana Student Progress and Promotions Committee (USPPC) for review and to determine what, if any, sanctions would be recommended. *Id., para. 19*.

The USPPC conducted a meeting on October 13, 2010 regarding the complaint. Plaintiff was not permitted to attend the meeting to defend himself from the allegations, to confront the witnesses against him or to address the evidence presented against him. Plaintiff was permitted to submit letter to the USPCC regarding the allegations, which he did. *Id., para. 20*. Upon review of the complaint and Plaintiff's letter, the USPCC recommend as sanctions that Plaintiff be assigned a mentor to meet with on a monthly basis to ensure that Plaintiff did not make similar mistakes in the future on his clinical rotations. At that point the matter was resolved. *Id., para. 21*.

Later, without any notice to Plaintiff, the complaint submitted by Drs. Kehl and Wozniak, the aforementioned letter Plaintiff wrote to the USPCC, and an additional letter drafted by Defendant, James W. Hall from 2008 were submitted to the Urbana Executive Committee (UEC). *Id., para. 22*. The letter from Hall stated that back in 2008 Plaintiff acted "unprofessionally" as a Teaching Assistant in the School of Molecular Biology. Plaintiff never had an opportunity to address this letter with the UEC and, in fact, Plaintiff was never cited for acting "unprofessionally" as a Teaching Assistant and there was certainly never a finding that Plaintiff acted unprofessionally in 2008. *Id., para. 23*.

The UEC disregarded the sanctions already issued against Plaintiff by the USPCC, and recommended that Plaintiff be dismissed from the College of Medicine on October 27, 2010 all without allowing Plaintiff to defend himself from the allegations, to confront the witnesses against

him or to address any of evidence presented against him, including false information presented to the UEC that Plaintiff acted unprofessionally as a Teaching Assistant in 2008. *Id., para. 24*.

Plaintiff timely appealed the decision of the UEC but the decision was upheld and forwarded to the College of Medicine Committee on Student Progress ("CCSP") for final action. *Id., para. 25*. Plaintiff was not permitted to challenge the allegations against him with the CCSP and on December 17, 2010 the CCSP voted to dismiss Plaintiff from the College of Medicine. *Id., para. 26*.

Plaintiff timely appealed the CCSP decision but the decision to dismiss him from the College of Medicine was upheld on January 28, 2011. *Id., para. 27*. The decisions made by Defendants to remove Plaintiff from the College of Medicine are arbitrary and capricious in nature, are in violation of the University's Student Disciplinary Policy, University Statutes, and in violation of Plaintiff's U.S. Constitutional Rights. *Id., para. 28*. As a result of Defendant's arbitrary, capricious, and unlawful actions, Plaintiff has been prevented from attending classes at the College of Medicine, thus halting and destroying his ability to attend medical school or to ever enter the medical profession. *Id., para. 29*. As a result of the above, Defendants, and each of them, have wrongly caused Plaintiff to be sanctioned and removed from the University and for the above-noted sanctions to be wrongly placed on his record, all in violation of his U.S. Constitutional Rights, depriving him of the opportunity to obtain an education and further his career, and inflicting emotional distress and physical injury, causing substantial damages. *Id., para. 30*.

Plaintiff brought a Complaint for Damages and injunctive relief against the University and faculty based upon 42 U.S.C. Section 1983 and the Fourteenth Amendment of the United States Constitution, alleging infringement of Plaintiffs' right to substantive and procedural due process and equal protection. Plaintiff also relies on the University's Student Disciplinary Policy and the University Statutes and alleges a pendent breach of contract claim. Plaintiff has also asserted a claim against University Defendant for negligent hiring, training, and supervision, and against all Defendants for intentional and negligent infliction of emotional distress and injunctive relief.

///

///

///

-3-

## II.

## LEGAL ARGUMENT

**A.    STANDARD UNDER RULE 12(b)(6) MOTION TO DISMISS**

Rule 12(b)(6) permits a motion to dismiss a complaint for failure to state a claim upon which relief can be granted. *E.E.O.C. v. Concentra Health Servs.,* 496 F.3d 773, 776 (7th Cir. 2007). To state such a claim, the complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has interpreted that language to impose two easy-to-clear hurdles. *Id.* First, the complaint must describe the claim in sufficient detail to give the defendant "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007) (*quoting Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *Reger Dev't LLC v. National City Bank*, 592 F.3d 759, 764 (7th Cir. 2010). Second, its allegations must plausibly suggest that the defendant has a right to relief, raising that possibility above a "speculative level"; if they do not, the plaintiff pleads itself out of court. *Bell Atlantic*, 127 S. Ct. at 1965, 1973 n.14.

The Court accepts as true all of the well-pleaded facts alleged by the plaintiff and all reasonable inferences that can be drawn therefrom. See *Barnes v. Briley*, 420 F.3d 673, 677 (7th Cir. 2005).

**B.    PLAINTIFF'S COMPLAINT HAS COMPLIED WITH FRCP 8(a).**

FRCP 8(a) states, in relevant part: "A pleading which sets forth a claim for relief, whether an original claim, counter-claim, cross-claim, or third-party claim, shall contain . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief . . ."

To state a claim upon which relief can be granted, a complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). That statement must be sufficient to provide the defendant with "fair notice" of the claim and its basis. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

Plaintiff's Complaint provides detailed explanations of the allegations being made against the University Defendant, as well as the individual Defendants. The allegations made in Plaintiff's Complaint were sufficient pursuant to FRCP 8(a) as they provide reasonable notice to the Defendants

of the allegations being made against them. Additionally, there is no heightened pleading standard as is set forth in FRCP 9 regarding any of Plaintiff's causes of action in this case.

## C. PLAINTIFF HAS ADEQUATELY PLED HIS PROCEDURAL DUE PROCESS CLAIM

### 1. Plaintiff Has a Protectable Property Interest in His Education at the University of Illinois at Chicago

The United States Supreme Court has established that students have a property interest in their education. ***Goss v. Lopez***, 419 U.S. 574 (1975).

> [A] student's legitimate entitlement to a public education [is] a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause. *Id.*

In *Goss*, the Court set aside the summary 10-day suspensions of nine high school students charged with various acts of disruptive conduct during school hours. *Id.* "At the very minimum," the Court held, due process required notice and an informal hearing prior to the students' suspension. *Id.*, 579 "[D]ue process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.* Had the suspension exceeded 10 days the Court might have required "more formal procedures." *Id.*, 584. The Court concluded that the adequacy of the notice and the nature of the hearing sufficient to satisfy due process would vary according to an "appropriate accommodation of the competing interests involved." *Id.*, 579. The *Goss* Court determined that high school students facing the deprivation of a property right by suspension from school must, at a minimum, "be given *some* kind of notice and afforded *some* kind of hearing." 419 U.S. 579 (emphasis in original).

In one example of *Goss's* application, ***Crook v. Baker***, 584 F. Supp. 1531, 1556 (E.D. Mich. 1984) the federal District Court for the Eastern District of Michigan held that a university student was entitled to notice and a hearing before the University of Michigan could rescind a graduate's master's degree on the grounds that he had fabricated data underlying his thesis. *Id.*

In ***Marin v. University of Puerto Rico***, 377 F. Supp. 613 (D.P.R. 1974), the federal District Court for the District of Puerto Rico held that students are entitled to:

(1) adequate advance notice of

    (a) the charges,
    (b) the specific, previously promulgated regulations under
        which the charges are brought, and
    (c) the evidence against the student;

(2) a full, expedited evidentiary hearing

    (a) presided over by an impartial, previously uninvolved
        official,
    (b) the proceedings of which are transcribed, at which the
        student
    (c) can present evidence and
    (d) cross-examine opposing witnesses,
    (e) with the assistance of retained counsel;

(3) a written decision by the presiding official encompassing

    (a) findings of fact,
    (b) the substantial evidence on which the findings rest, and
    (c) the reasons for the official's conclusion. *Id.*, 623.

The ***Marin*** court held that these due process protections must be guarded most scrupulously when the university's action may damage the student's standing in the community, or may impose a stigma or "mark on one's record that may well preclude further study at any public and many private institutions and limit the positions one can qualify for after termination of one's studies." *Id.*, 622, *citing* ***Roth***, 408 U.S. 573.

In a case involving a private college, the United States District Court for the District of Vermont reversed Middlebury College's one year suspension of a student, holding that the school deviated from its published notice policy by informing the accused student of only one of the two charges that had been brought against him. ***Fellheimer v. Middlebury Coll.***, 869 F. Supp. 238, 246-247 (D. Vt. 1994). The court held that the college must "state the nature of the charges with sufficient particularity to permit the accused party to meet the charges," as expressed in the school's policy. *Id.*

It is clear from the cases set forth above that Plaintiff does, in fact, have a property right in his education. This right is protected under the Fourteenth Amendment to the United States Constitution. Plaintiff alleges:

34.    Defendant failed to comply with its own policies and due process protections set forth in its Student Disciplinary Policy by failing to allow Plaintiff a hearing, to be present and defend himself from the allegations against him, to confront the

-6-

witnesses against him or to address any of evidence presented against him.

35.     As a result of Defendants actions, Plaintiff suffered and continues to suffer a deprivation of his rights, privileges and immunities secured to them by the Fourteenth Amendment to the United States Constitution, and is thus entitled to an award of monetary damages from the individual Defendants.

Plaintiff's Complaint sets forth that he was deprived and continues to be deprived of this right. Plaintiff alleged that he was not permitted to attend the meeting to defend himself from the allegations, to confront the witnesses against him or to address the evidence presented against him to the USPCC. *Complaint para. 20*. Plaintiff was also not permitted to defend himself from the allegations to the UEC or to confront the witnesses against him or to address any of evidence presented against him, including false information presented to the UEC that Plaintiff acted unprofessionally as a Teaching Assistant. *Id., para. 24*. Accordingly, Plaintiff's Complaint presents a factual basis showing that he had a protected interest in his education and that he was deprived of that right without due process.

## 2.     Plaintiff's Complaint Is Clear That He Was Not Afforded the Required Process He Was Owed Prior to His Disciplinary Dismissal from the University

The Supreme Court has set forth that there is "a significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct. This difference calls for far less stringent procedural requirements in the case of an academic dismissal." ***Board of Curators of University of Missouri v. Horowitz***, 435 U.S. 78, 86 (1978). The Seventh Circuit Court of Appeals has stated that more extensive procedures than even those required in *Goss* are required in the context of a university dismissal and that due process requirements depend upon context. *See **Pugel v. Board of Trustees of University of Ill.***, 378 F.3d 659, 663 (7th Cir., 2004). The severity of the deprivation suggests the appropriateness of "more formal procedures." ***Id.,*** at 664, quoting *Goss*, 419 U.S. at 584. In ***Than v. Univ. Texas Med. School Houston***, 188 F.3d 633 (5th Cir., 1999), the Fifth Circuit Court of Appeals concluded that a student was not deprived of due process on a charge of academic dishonesty when the process the student received included (1) ample notice of the charges and the evidence, (2) a hearing before an impartial and knowledgeable hearing officer and (3) representation at that hearing by counsel, who was able to call nine witnesses, to introduce more than sixty exhibits, to cross-examine adverse witnesses and to make an opening

and closing statement. *See **Id.*** at 634.

Plaintiff's Complaint is clear that his dismissal was disciplinary in nature as he was dismissed for "unprofessional" conduct and charged with academic dishonesty. *Complaint, para. 16*. Plaintiff was not, and has not alleged, that he was dismissed for any academic failures. Defendants' statement in their Motion that Plaintiff "concedes that he was dismissed based upon his academic performance" is completely disingenuous. *Dkt #12, p. 5*. Defendants are obviously confused and have erroneously equated academic performance with academic dishonesty. Academic dishonesty is a conduct violation, not an academic violation, such as a failing grade or a low grade point average. Contrary to Defendants' assertions in their Motion, Plaintiff was entitled to all the due process required under a disciplinary dismissal, not an academic dismissal.

Defendants have even acknowledged in their Motion that Plaintiff pled he was dismissed for unprofessional conduct and that he was dismissed based upon a complaint submitted by Doctors Kehl and Wozniak wherein they alleged Plaintiff committed academic misconduct during his OBGYN rotation by turning in written work containing plagiarized patient histories. *Id., p. 2*. In fact, Doctors Kehl and Wozniak were Plaintiff's preceptors for the OBGYN rotation for only the final week out of the 8 week rotation. Plaintiff's preceptor during that rotation was initially Dr. Gratkins. Dr. Gratkins took a personal leave of absence after a few weeks but spoke with Dr. Kehl and obtained permission from Dr. Kehl on behalf of Plaintiff to finish the rotation with Dr. Gratkins' partner Dr. Ristic. At the end of Plaintiff's rotation, Dr. Gratkins, who graded the patient reports Doctors Kehl and Wozniak alleged were plagiarized, gave Plaintiff a passing grade on the reports and in the rotation. Dr. Gratkins then submitted grades to the University showing that Plaintiff successfully passed the rotation. After Dr. Gratkins gave Plaintiff passing grades, Dr. Kehl contacted him and insisted that he change Plaintiff's grade and fail Plaintiff on the OBGYN rotation. Dr. Gratkins refused to do so and maintained that Plaintiff successfully passed all aspects of the rotation and that no professionalism violation occurred. Therefore, Plaintiff has clearly alleged that his dismissal was based upon unprofessional conduct and plagiarism, which is a disciplinary dismissal, and not due to academic failure.

Contrary to Defendants' assertions in their Motion, Plaintiff was entitled to all the due

process required under a disciplinary dismissal, not an academic dismissal. As is set forth in Plaintiff's Complaint, he did not receive the due process to which he was entitled prior to his dismissal from the University. *Complaint, para. 32-34*.

The USPPC conducted a meeting on October 13, 2010 regarding the complaint. Plaintiff was not permitted to attend the meeting to defend himself from the allegations, to confront the witnesses against him or to address the evidence presented against him. Plaintiff was only permitted to submit letter to the USPCC regarding the allegations, which he did. *Id., para. 20*.

Later, without any notice to Plaintiff, the complaint submitted by Drs. Kehl and Wozniak, the aforementioned letter Plaintiff wrote to the USPCC, and an additional letter drafted by Defendant, James W. Hall from 2008 were submitted to the Urbana Executive Committee (UEC). *Id., para. 22*. The letter from Hall stated that back in 2008 Plaintiff acted "unprofessionally" as a Teaching Assistant in the School of Molecular Biology. Plaintiff never had an opportunity to address this letter with the UEC and, in fact, Plaintiff was never cited for acting "unprofessionally" as a Teaching Assistant and there was certainly never a finding that Plaintiff acted unprofessionally in 2008. *Id., para. 23*. Defendants relied upon a letter falsely claiming Plaintiff acted unprofessionally as a Teaching Assistant in 2008, but Plaintiff never received the benefit of any due process whatsoever in 2008 when these allegations were made, yet his educational record was wrongfully tarnished based upon unfounded allegations which were used against him in his 2010 dismissal from the University.

Moreover, the UEC disregarded the sanctions already issued against Plaintiff by the USPCC, and recommended that Plaintiff be dismissed from the College of Medicine on October 27, 2010 all without allowing Plaintiff to defend himself from the allegations, to confront the witnesses against him or to address any of evidence presented against him, including false information presented to the UEC that Plaintiff acted unprofessionally as a Teaching Assistant in 2008. *Id., para. 24*.

Plaintiff timely appealed the decision of the UEC but the decision was upheld and forwarded to the College of Medicine Committee on Student Progress ("CCSP") for final action. *Id., para. 25*. Plaintiff was again not permitted to challenge the allegations against him with the CCSP and on December 17, 2010 the CCSP voted to dismiss Plaintiff from the College of Medicine. *Id., para.*

*26.*

During Plaintiff's dismissal and appeal process he was not provided with due process even remotely close to what is required under the law. Plaintiff did not receive ample notice of the charges and the evidence against him, he did not receive a hearing before an impartial and knowledgeable hearing officer and Plaintiff was allowed to appear at any hearing, let alone be represented at that hearing by counsel. Plaintiff was not able to call witnesses, to introduce evidence, to cross-examine adverse witnesses, or to make an opening and closing statement. *See Than*, 188 F.3d at 634. Accordingly, Defendants' Motion to dismiss Plaintiff's procedural due process claim must be denied.

## C.  PLAINTIFF HAS ADEQUATELY PLED HIS SUBSTANTIVE DUE PROCESS CLAIM

In addition to the procedural protections outlined above, the Due Process Clause of the Fourteenth Amendment provides a guarantee against arbitrary decisions that would impair Plaintiff's constitutionally protected interests. *Dixon v. Alabama State Board of Education*, 294 F.2d 150, 157 (5th Cir. 1961), cert. denied, 368 U.S. 930 (1961)*.* This guarantee of "substantive due process" protects certain fundamental "substantive" rights we all share. As the court stated in *Dixon*, "the governmental power to expel the plaintiffs...is not unlimited and cannot be arbitrarily exercised. Admittedly, there must be some reasonable and constitutional ground for expulsion or the courts would have a duty to require reinstatement." *Dixon*, 294 F.2d at 157. Under principles of substantive due process, students cannot be disciplined for constitutionally protected actions, or for actions which the government has no legitimate interest in punishing.

In addition to protecting such fundamental rights as free speech, substantive due process assures that any government action bear, at a minimum, a rational relationship to a legitimate governmental interest. In *Alabama & Coushatta Tribes v. Big Sandy School District*, 817 F.Supp. 1319 (E.D. Tex. 1993), the federal District Court for the Eastern District of Texas provided two theories upon which a successful substantive due process claim may be made. "If the suspensions were patently unreasonable or disproportionate to the offense, the [students] would be entitled to relief," or, if there was a "substantial departure from academic norms," the student would also be entitled to relief. *Id*. at 1335. The Eighth Circuit Court of Appeals has held that in an academic

setting, to succeed on a substantive due process claim, a student must show that there was "no rational basis for the College's decision or that dismissal was motivated by bad faith or ill will unrelated to academic performance." *Richmond v. Fowlkes*, 228 F.3d 854, 859 (8th Cir. 2000).

Defendants argue that Plaintiff does not have a fundamental right meriting substantive due process protection. This argument is without merit.

The basic legal relation between a student and a private university or college is contractual in nature, a student may establish that an implied contract existed between himself and the university that entitled the student to a specific right, such as the right to a continuing education or the right not to be suspended without good cause. *Ross v. Creighton University*, 957 F.2d 410, 416 (7th Cir. 1992).

The catalogues, bulletins, circulars, and regulations of the institution made available to the matriculant may become a part of the contract. *Id.*. A right established by an implied contract between a student and a university can be a property interest subject to constitutional protection, but to receive such protection, the student must first show that the implied contract establishes an entitlement to a tangible continuing benefit. *Bissessur v. Indiana University Bd. of Trustees*, 581 F.3d 599 (7th Cir., 2009), citing *Board of Regents of State Colleges v. Roth,* 408 U.S. 564 (1972).

In this case, Plaintiff has pled that his contract with the University established an entitlement to a tangible continuing benefit, i.e, continuing his education at the University medical school. Plaintiff's Complaint states:

> 28. The decisions made by Defendants to remove Plaintiff from the College of Medicine are arbitrary and capricious in nature, are in violation of the University's Student Disciplinary Policy, University Statutes, and in violation of Plaintiff's U.S. Constitutional Rights.
>
> 29. As a result of Defendant's arbitrary, capricious, and unlawful actions, Plaintiff has been prevented from attending classes at the College of Medicine, thus halting and destroying his ability to attend medical school or to ever enter the medical profession.
>
> 30. As a result of the above, Defendants, and each of them, have wrongly caused Plaintiff to be sanctioned and removed from the University and for the above-noted sanctions to be wrongly placed on his record, all in violation of his U.S. Constitutional Rights, depriving him of the opportunity to obtain an education and further his career, and inflicting emotional distress and physical injury, causing substantial damages.

Moreover, Plaintiff's Complaint sets forth how the university's conduct in dismissing Plaintiff was arbitrary and capricious. Plaintiff alleged that upon review of the complaint submitted

by Doctors Kehl and Wozniak and Plaintiff's letter, the USPCC recommend as sanctions that Plaintiff be assigned a mentor to meet with on a monthly basis to ensure that Plaintiff did not make similar mistakes in the future on his clinical rotations. At that point the matter was resolved. *Complaint, para 21.* Then for an unknown reason, and without any notice to Plaintiff, the complaint submitted by Drs. Kehl and Wozniak and an additional letter drafted by Defendant, James W. Hall from 2008, which contained false statements about Plaintiff somehow acting unprofessionally as a teaching assistant were wrongfully submitted to the Urbana Executive Committee (UEC). *Id. para 23.* The UEC then disregarded the recommendation of the USPCC, that Plaintiff repeat the OBGYN rotation and recommended that Plaintiff be dismissed from the College of Medicine. Plaintiff was not permitted to address the false allegations, to confront the witnesses against him or to address any of evidence presented against him, including false information presented to the UEC that Plaintiff acted unprofessionally as a Teaching Assistant. *Id., para. 24.*

Moreover, Plaintiff received a passing grade in the rotation. His preceptor, Dr. Gratkins submitted Plaintiff's grades to the University showing that Plaintiff successfully passed the rotation. After Dr. Gratkins gave Plaintiff passing grades, Dr. Kehl contacted him and insisted that he change Plaintiff's grade and fail Plaintiff on the OBGYN rotation. Dr. Gratkins refused to do so and maintained that Plaintiff successfully passed all aspects of the rotation and that no professionalism violation occurred. Yet, Defendants arbitrarily maintained that Plaintiff failed his rotation due to plagiarism and unprofessional conduct despite the passing grades given to him by his preceptor. Moreover, even after Plaintiff was arbitrarily failed from his rotation, his sanction was to repeat the rotation. Nonetheless, Defendants arbitrarily recommended that Plaintiff be dismissed from the University based upon a false report of unprofessional behavior which occurred two years earlier. To this day, Plaintiff is unaware of the unprofessional conduct Defendants claim he committed. Accordingly, Plaintiff has established all aspects his claim for substantive due process violation and Defendants' motion to dismiss this claim should be denied.

**D. PLAINTIFF HAS ADEQUATELY PLED THE 42 U.S.C. §1983 EQUAL PROTECTION CLAIM**

Defendants' treatment of Plaintiff has created a "class of one" whereby Plaintiff was singled out and retaliated against due to personal animus of the Defendants. The acts and/or omissions by

the Defendants were performed in violation of Plaintiffs' right to be afforded Equal Protection of the Laws, as guaranteed by the Fourteenth Amendment to the United States Constitution.  This constitutional violation qualifies Plaintiffs' §1983 claims.  The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within a state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents. U.S.C.A. Const.Amend. 14.

The Supreme Court of the United States, however, held in ***Village of Willowbrook v. Olech***, 528 U.S. 562, 120 S.Ct. 1073 (2000), that a plaintiff can assert an equal protection claim as a "class of one."  In ***Village of Willowbrook***, Grace Olech and her late husband Thaddeus asked the Village of Willowbrook (hereinafter referred to as "Village") to connect their property to the municipal water supply.  The Village at first conditioned the connection on the Olechs granting the Village a 33-foot easement.  The Olechs objected, claiming that the Village only required a 15-foot easement from other property owners seeking access to the water supply.  After a 3-month delay, the Village relented and agreed to provide water service with only a 15-foot easement. ***Id.*** at 563, 1074.

The Olechs sued the Village, claiming that the Village's demand of an additional 18-foot easement violated the Equal Protection Clause of the Fourteenth Amendment. Olech asserted that the 33-foot easement demand was "irrational and wholly arbitrary", that the Village's demand was actually motivated by ill will resulting from the Olechs' previous filing of an unrelated, successful lawsuit against the Village, and that the Village acted either with the intent to deprive Olech of her rights or in reckless disregard of her rights. ***Id.***

The District Court dismissed the lawsuit pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a cognizable claim under the Equal Protection Clause.

Relying on Circuit precedent, the Court of Appeals for the Seventh Circuit reversed, holding that a plaintiff can allege an equal protection violation by asserting that state action was motivated solely by a " 'spiteful effort to "get" him for reasons wholly unrelated to any legitimate state objective.' " 160 F.3d 386, 387 (1998) (*quoting **Esmail v. Macrane**,* 53 F.3d 176, 180 (7th Cir. 1995)).  The Court of Appeals determined that Olech's complaint sufficiently alleged such a claim. 160 F.3d, at 388.

The Supreme Court granted certiorari to determine whether the Equal Protection Clause gives rise to a cause of action on behalf of a "class of one" where the plaintiff did not allege membership in a class or group.[1] 527 U.S. 1067, 120 S.Ct. 10, 144 L.Ed.2d 841 (1999).

The Supreme Court held that its cases have recognized successful equal protection claims brought by a "class of one," where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. ***Village of Willowbrook v. Olech***, 528 U.S. 562, 564, 120 S.Ct. 1073, 1074 (2000) (*citing* ***Sioux City Bridge Co. v. Dakota County***, 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 (1923); ***Allegheny Pittsburgh Coal Co. v. Commission of Webster Cty.***, 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989)).

The Supreme Court continued to hold:

> "The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Sioux City Bridge Co., supra,* at 445, 43 S.Ct. 190 (*quoting **Sunday Lake Iron Co. v. Township of Wakefield,*** 247 U.S. 350, 352, 38 S.Ct. 495, 62 L.Ed. 1154 (1918)).  That reasoning is applicable to this case. Olech's complaint can fairly be construed as alleging that the Village intentionally demanded a 33-foot easement as a condition of connecting her property to the municipal water supply where the Village required only a 15-foot easement from other similarly situated property owners. *See **Conley v. Gibson**,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The complaint also alleged that the Village's demand was "irrational and wholly arbitrary" and that the Village ultimately connected her property after receiving a clearly adequate 15-foot easement. These allegations, quite apart from the Village's subjective motivation, are sufficient to state a claim for relief under traditional equal protection analysis.

*Village of Willowbrook v. Olech*, 528 U.S. 562, 564-565, 120 S.Ct. 1073, 1074-1075 (2000).

---

[1]

The Court noted in a footnote that:

> We note that the complaint in this case could be read to allege a class of five. In addition to Grace and Thaddeus Olech, their neighbors Rodney and Phyllis Zimmer and Howard Brinkman requested to be connected to the municipal water supply, and the Village initially demanded the 33-foot easement from all of them. The Zimmers and Mr. Brinkman were also involved in the previous, successful lawsuit against the Village, which allegedly created the ill will motivating the excessive easement demand. *Whether the complaint alleges a class of one or of five is of no consequence because we conclude that the number of individuals in a class is immaterial for equal protection analysis.*

*Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 1074 (2000) (emphasis added).

-14-

Accordingly, the Supreme Court affirmed the judgment of the Court of Appeals. The Supreme Court has upheld its holding in *Village of Willowbrook*. *See Engquist v. Oregon Dept. of Agr.*, 128 S.Ct. 2146 (2008).

Defendants argue that Plaintiff failed to identify any "similarly situated" individuals that were treated more favorably than him. With the large number of same-sex marriage cases currently and recently being litigated in state and federal courts around the country, equal protection issues, and the definition of the term "similarly situated," has become more refined. In many of those cases, marriage equality opponents pressed a "threshold"-type similarly situated analysis. *In re Marriage Cases*, 183 P.3d 384, 435 n.54 (Cal. 2008); *Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407 (Conn. 2008); *Varnum v. Brien*, 763 N.W.2d 862, 882 (Iowa 2009). Under this scheme, if the two groups are not similarly situated, there is no need to proceed to the merits of equal protection review. *Id*. Judges in Iowa and California noted that this asserted formulation permits an end-run around full equal protection analysis, which properly focuses on the "fit" between the legislative classification and the purpose of the statute. *In re Marriage Cases*, 183 P.3d at 435 n.54; *Varnum*, 763 N.W.2d at 883-84.

In their influential 1949 article, one of the few to address the meaning of "similarly situated," Tussman and tenBroek explained that "[a] reasonable classification is one which includes all persons who are similarly situated with respect to the purpose of the law." Joseph Tussman & Jacobus tenBroek, *The Equal Protection of the Laws*, 37 CALIF. L. REV. 341, 346, note 17 (1949). Citing Tussman and tenBroek's article, the *Varnum* court stated that whether two groups are "similarly situated" cannot be defined solely by the trait identified by the legislature in drafting the statute. *Varnum* at 882-83 (citing Tussman & tenBroek, *supra* note 17, at 344-47). The Iowa court concluded that the plaintiffs were "similarly situated" to straight couples because they "[we]re in committed and loving relationships, many raising families, just like heterosexual couples." *Varnum*, 763 N.W.2d at 883. This meant that the plaintiffs were "similarly situated in every important respect, but for their sexual orientation," for the purpose of Iowa marriage laws, "which are designed to bring a sense of order to the legal relationships of committed couples and their families in myriad ways." *Id*. at 883-84. The court held that the conception of the "similarly situated" requirement

pressed by the local government was "circular" and would result in "all distinctions . . . evad[ing] equal protection review." *Id*. at 884.

In *Kerrigan v. Commissioner of Public Health*, the Connecticut Supreme Court held that a law violates equal protection if "either on its face or in practice, [it] treat[s] persons standing in the same relation to it differently." *Kerrigan*, 957 A.2d at 421 (quoting *Stuart v. Comm'r of Corr.*, 834 A.2d 52, 56 (Conn. 2003)) (internal quotation marks omitted). "[Accordingly]," the court continued, "the analytical predicate [of an equal protection claim] is a determination of who are the persons [purporting to be] similarly situated." *Id*. at 421-22 (alterations in original) (quoting *Stuart*, 834 A.2d at 56) (internal quotation marks omitted).

Although accepting the "threshold" or "initial" nature of the inquiry, the court nonetheless focused on "fit," reiterating that the question is *"not whether persons are similarly situated for all purposes, but whether they are similarly situated for purposes of the law challenged."* *Id*. at 422 (quoting *Stuart*, 834 A.2d at 56) (emphases added). The purpose of the ordinances and laws that the Boar Appellants are challenging the application of in this case, apply equally to the properties identified. Regardless if those properties are zoned differently, used for different types of businesses, or are even government owned, the purpose of the applicable ordinances or laws are equal.

The United States Supreme Court addressed the proper application of the "similarly situated" threshold in *Williams v. Vermont*, a 1985 case that challenged a Vermont "use" tax imposed on cars registered by owners who purchased them out-of-state before becoming Vermont residents. *Williams v. Vermont*, 472 U.S. 14, 15-16 (1985). The Court, in an opinion by Justice White, first identified the purpose of the Vermont Motor Vehicle Purchase and Use Tax—to "improve and maintain" the roads. *Id*. at 18 (quoting VT. STAT. ANN. tit. 32, § 8901 (1981)) (internal quotation marks omitted). It then considered whether the classification drawn—whether the taxpayer was a Vermont resident at the time she purchased a vehicle and paid a sales tax in another state—bore a rational relationship to the statutory purpose. *Id*. at 23-24. The Court analyzed whether the two classes of Vermont residents were "similarly situated" with respect to the legislative aim. *Id*. Apart from the classifying trait (i.e., whether they were residents of Vermont at the time they purchased their vehicle out-of-state), both groups were "similarly situated for all relevant purposes." *Id*.

-16-

Individuals in both groups were currently Vermont residents, used a car in Vermont, and possessed "an equal obligation to pay for the maintenance and improvement of Vermont's roads." *Id*. Thus, the Court concluded that "[t]he purposes of the statute would be identically served, and with an identical burden, by taxing each" and that "[t]he distinction between them bears no relation to the statutory purpose." *Id*. at 24.

In *Village of Willowbrook v. Olech*, the Court held that the equal protection "class of one" claim applies when there is no rational basis for the plaintiff to be treated differently than someone "similarly situated." 528 U.S. 562, 564 (2000). However, the "similarly situated" analysis in *Williams* is fully integrated into the rational basis review and focused on "fit." *See* Araiza, *Constitutional Rules*, *supra* note 14 (identifying a "concern with 'fit' analysis in traditional equal protection doctrine"); Araiza, *Irrationality and Animus*, *supra* note 14, at 503, 505 (noting the importance of "fit" in equal protection analysis). With many of the properties identified by Appellants, the Appellees in this case have not challenged that they were treated differently or more favorably, but that they were not identical, and thus not "similarly situated." That argument, which was the basis of the district court's granting of summary judgment on the equal protection claim, is not valid.

"[W]here, as here, 'there is no reason to believe that the disadvantaged class is different, in *relevant* respects' from a similarly situated class, this court may conclude that it is *only* irrational prejudice that motivates the challenged classification." ***Lofton v. Sec'y of the Dep't of Children and Family Servs.***, 377 F.3d 1275, 1280 (11th Cir. 2004).

In this Circuit, to succeed on a class of one claim, Plaintiff must show that the University intentionally discriminated against him and that there is no rational basis for Defendants' actions. ***Del Marcelle v. Brown Cnty. Corp.***, 680 F.3d 887, 913 (7th Cir., 2012). Plaintiff has met these pleading requirements. Specifically, Plaintiff pled:

> 46. That the above actions by Defendants have resulted in the denial of equal protection rights, as a "class of one," all in violation of the Fourteenth Amendment to the United States Constitution, as Plaintiff was retaliated against, harassed, disciplined against, intimidated, and dismissed from the medical school, all against his will, and differently than those similarly situated medical students subjected to the USPPC review process.

> 47. That the actions of Defendants were the result of personal animus against the Plaintiff, and said actions and denials were taken without any rational basis.

48.     That by reason of the aforesaid actions, Defendants' actions exhibit deliberate indifference to and/or reckless disregard for the constitutional rights of Plaintiff and other similarly situated students, all in violation of his constitutional rights.

Moreover, Plaintiff is aware of specific similarly situated students who were treated more favorably than him. Defendants claim that Plaintiff committed a professionalism violation by not completing his quizzes in a timely manner. This allegation was false because students in the OBGYN rotation were permitted to turn in their course work up until the stated date of the end of the clerkship, which was what Plaintiff did. Another student in the OBGYN rotation, Dr. Li, turned in her course work on the same date Plaintiff turned his in but she was not cited for a professionalism violation. Defendants in turn used this false professionalism violation against Plaintiff in his disciplinary dismissal. Plaintiff can easily identify individuals that were similarly situated to him who were treated more favorably, thus Defendants' motion should be denied.

**E.     ELEVENTH AMENDMENT IMMUNITY DOES NOT APPLY TO INDIVIDUAL DEFENDANTS OR THE ABILITY OF THIS COURT TO ENJOIN ALL DEFENDANTS.**

State officials may be held personally liable for damages under § 1983 based upon actions taken in their official capacities. *Hafer v. Melo*, 502 U.S. 21 (1991). It is incorrect for a district court to interpret *Will v. Michigan Dept. of State Police*, 491 U.S. 58 (1989) to mean that § 1983 does not authorize suits against state officials for damages arising from official acts. *Hafer* at 23. State executive officials are not entitled to absolute immunity for their official actions. *Id*. at 29, *citing Scheuer v. Rhodes*, 416 U.S. 232, 243 (1974). Even if state law requires the state to pay any damages awarded against a state official, a § 1983 action is not "against" the state for the purposes of the Eleventh Amendment immunity. *Demery v. Kupperman*, 135 F.2d 1139 (9th Cir. 1984).

Moreover, nearly 100 years ago the United States Supreme Court cleared the way for plaintiffs, to enforce their Constitutional Rights against state officials through injunctive relief. *Ex parte Young*, 209 U.S. 123 (1908). The Court held that injunctive relief may be obtained through the federal courts when state officials are accused of violating the Fourteenth Amendment:

> [T]he use of the name of the State to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of and one which does not affect the State in its sovereign or governmental capacity . . . . The officer . . . is in that case stripped of his official or representative character and is subjected in his person

-18-

to the consequences of his individual conduct.
*Id*., at 159-160.

In other words, even if a state is immune from injunctive relief, the federal courts can put an end to unconstitutional conduct by state officials, by enjoining those state officials in their individual capacity. *Id*.

The University is subject to the injunction powers of this court, as Plaintiff's claims are constitutional in nature, not statutory.

Plaintiff has the right to bring causes of action for money damages against the individual Defendants. **Hafer v. Melo**. This court has every ability to enjoin *all* Defendants from continuing to violate Plaintiff's constitutional rights. It may be accomplished by an order to the State university, or by an order to the individual defendants in their individual capacity, pursuant to **Ex parte Young** 209 U.S. 123 (1908).

Moreover, the Eleventh Amendment does not bar federal suits against state officials, in their official capacity, where the relief sought is prospective in nature and is based on an on-going violation of the plaintiff's *federal* constitutional or statutory rights. **Id.** That is certainly the case here. As alleged in Plaintiff's Complaint, Defendants have dismissed him from the University, have made notations upon his transcripts of the unlawful disciplinary actions taken against him. As such, Defendants continue to violate Plaintiff's Fourteenth Amendment Rights, which gives this Court jurisdiction over Defendants in their *official* capacity, and Defendants are not entitled to Eleventh Amendment immunity in their official capacity.

**F.     INDIVIDUAL DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY AS THEIR ACTIONS VIOLATED PLAINTIFF'S CLEARLY ESTABLISHED STATUTORY AND CONSTITUTIONAL RIGHTS**

A defendant is entitled to qualified immunity if the defendant did not violate "clearly established rights" at the time of the conduct in question. See, **Harlow v. Fitzgerald**, 457 U.S. 800, 818 (1982). In their Motion to Dismiss, Defendants point to the two-prong test established in **Saucier v. Katz**, 533 U.S. 194 (2001).

The test for qualified immunity is objective. The defendant's actual purpose or state of mind is not material. Whether rights were "clearly established" at the relevant time is determined in most

instances by looking at controlling published court decisions as of that time. See, ***United States v. Lanier***, 520 U.S.259, 269-71 (1997) (discussing qualified immunity in § 1983 and ***Bivens*** cases).

While the law in this matter is clearly established in favor of Plaintiff, it is not necessary for a plaintiff to show a published decision establishing the rights in question under precisely the same circumstances as those presented in the case in question. Some conduct so clearly violates a person's rights that the question is unlikely to come before the courts for a decision. The Supreme Court has explained in the context of both fair warning for criminal law and qualified immunity for civil rights defendants, that "general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" ***United States v. Lanier***, 520 U.S. at 271, *quoting* ***Anderson v. Creighton***, 483 U.S. 635, 640 (1987). To rule that until the Supreme Court has spoken, no right of litigants in this circuit can be deemed established before we have decided the issue would discourage anyone from being the first to bring a damages suit in this court; he would be certain to be unable to obtain any damages. ***Burgess v. Lowery***, 201 F.3d 942, 85 A.L.R.5th 719 (7th Cir. 2000) (affirming denial of summary judgment based on qualified immunity).

The absence of such cases, however, does not mean a government employee is entitled to immunity for such conduct. "There has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune ... because no previous case had found liability in those circumstances." ***K.H. ex rel. Murphy v. Morgan***, 914 F.2d 846, 851 (7th Cir.1990). The controlling question is whether a reasonable government official would have understood at the time of the conduct in question that the conduct violated the plaintiffs' constitutional rights.

In this matter, however, the United States Supreme Court has clearly established the law, by way of their decision in ***Goss v. Lopez***, 419 U.S. 574 (1975).

> [A] student's legitimate entitlement to a public education [is] a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause. ***Id.***

Numerous other cases have also expressed the due process rights of public university

-20-

students. ***Dixon v. Alabama State Board of Education***, 294 F.2d 150 (5th Cir. 1961), *cert. denied*, 368 U.S. 930 (1961); ***Marin v. University of Puerto Rico***, 377 F. Supp. 613 (D.P.R. 1974); ***Crook v. Baker***, 584 F. Supp. 1531, 1556 (E.D. Mich. 1984); ***Gabrilowitz v. Newman***, 582 F.2d 100 (1st Cir. 1978).

The Fourteenth Amendment protection that is owed to Plaintiff has been clearly established as far back as ***Dixon v. Alabama State Board of Education*** in 1961, or at least since ***Goss v. Lopez*** in 1975. The Defendant state officials in this case knew that Plaintiff was entitled to due process, and knew what "due process" was, but deliberately violated Plaintiff's constitutional rights by arbitrarily dismissing him from the University. As a result, Defendants violated Plaintiff's "clearly established rights." ***Harlow; Saucier***. Thus, individual Defendants are not entitled to qualified immunity in this case.

## G. PLAINTIFF'S STATE CLAIMS EACH SUFFICIENTLY ALLEGE A PROPER CAUSE OF ACTION.

### 1. Breach of Contract

This cause of action is against the University Defendant and is not subject to Eleventh Amendment immunity. As is set forth above, plaintiffs may enforce their Constitutional Rights against state officials through injunctive relief. ***Ex parte Young***, 209 U.S. 123 (1908). Injunctive relief may be obtained through the federal courts when state officials are accused of violating the Fourteenth Amendment:

> [T]he use of the name of the State to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of and one which does not affect the State in its sovereign or governmental capacity . . . . The officer . . . is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct.

*Id*., at 159-160.

Even if a state is immune from injunctive relief, the federal courts can put an end to unconstitutional conduct by state officials, by enjoining those state officials in their individual capacity. *Id*. Because the University is subject to the injunction powers of this court, this Court has jurisdiction over Plaintiff's breach of contract claim inasmuch as Plaintiff is seeking injunctive relief requiring the University to comply with the terms of its agreements with Plaintiff.

The basic legal relation between a student and a private university or college is contractual

-21-

in nature, a student may establish that an implied contract existed between himself and the university that entitled the student to a specific right, such as the right to a continuing education or the right not to be suspended without good cause. ***Ross,*** 957 F.2d at 416. The catalogues, bulletins, circulars, and regulations of the institution made available to the matriculant may become a part of the contract. ***Id.***

As is set forth in Plaintiff's Complaint, he has an express and implied contract with Defendants in connection with rights explicitly guaranteed by the Student Disciplinary Policy and the University Statutes, and other written policies and procedures of the Defendants, including but not limited the policies on equal educational opportunities, student discipline and disciplinary procedures. The USPPC conducted a meeting on October 13, 2010 regarding the complaint. Plaintiff was not permitted to attend the meeting to defend himself from the allegations, to confront the witnesses against him or to address the evidence presented against him in violation of the University's student disciplinary policy. *Complaint, para. 20*.

Later, without any notice to Plaintiff, and against in violation of the University student disciplinary policy, the complaint submitted by Drs. Kehl and Wozniak, the aforementioned letter Plaintiff wrote to the USPCC, and an additional letter drafted by Defendant, James W. Hall from 2008 were submitted to the Urbana Executive Committee (UEC). *Id., para. 22*. The letter from Hall stated that back in 2008 Plaintiff acted "unprofessionally" as a Teaching Assistant in the School of Molecular Biology. Plaintiff never had an opportunity to address this letter with the UEC and, in fact, Plaintiff was never cited for acting "unprofessionally" as a Teaching Assistant and there was certainly never a finding that Plaintiff acted unprofessionally in 2008. *Id., para. 23*. Defendants relied upon a letter falsely claiming Plaintiff acted unprofessionally as a Teaching Assistant in 2008, but Plaintiff never received the benefit of any due process whatsoever in 2008 when these allegations were made, yet his educational record was wrongfully tarnished based upon unfounded allegations which were used against him in his 2010 dismissal from the University.

Moreover, the UEC disregarded the sanctions already issued against Plaintiff by the USPCC, and recommended that Plaintiff be dismissed from the College of Medicine on October 27, 2010 all without allowing Plaintiff to defend himself from the allegations, to confront the witnesses against

him or to address any of evidence presented against him, including false information presented to the UEC that Plaintiff acted unprofessionally as a Teaching Assistant in 2008. *Id., para. 24.*

Plaintiff was again not permitted to challenge the allegations against him with the CCSP and on December 17, 2010 the CCSP voted to dismiss Plaintiff from the College of Medicine. *Id., para. 26.* The actions of Defendants constitute a breach of the express and implied contract with Plaintiff.

The University has established a conduct code and rules, published them in its handbook, published them on their website, and is requiring its students to live by those Codes. They too are required to honor it. By conducting said hearings and refusing to allow Plaintiff the process he was entitled to under the student disciplinary policy, they breached their contract with Plaintiff. By failing to correct these material failures on appeal, they breached their contract with Plaintiff. This cause of action is sufficiently plead in Plaintiff's Complaint.

### 2. Intentional Infliction of Emotional Distress (IIED)

This Court has jurisdiction of Plaintiff's IIED claim as it is brought against the individual Defendants in their individual capacity. In that regard, the Court may exercise its supplemental jurisdiction over this claim pursuant to 28 U.S.C. §1367, as this claim arises out of the same transactions and occurrences as Plaintiff's federal claims.

Defendants correctly set out the elements of a claim for intentional infliction of emotional distress. In this case, Plaintiff alleges and has set forth facts showing that the Defendants' conduct constitutes: (1) extreme and outrageous conduct; (2) intending or knowing there was a high probability the Plaintiff would suffer severe emotional distress; (3) which resulted in Plaintiff suffering severe emotional distress. Defendants have acted intentionally or with reckless disregard to the probability that the Plaintiff would suffer emotional distress by submitting by a letter drafted by Defendant, James W. Hall from 2008 which contained false statements about Plaintiff somehow acting unprofessionally as a teaching assistant were wrongfully submitted to the Urbana Executive Committee (UEC). *Id. para 23.* By disregarding the recommendation of the USPCC, that Plaintiff repeat the OBGYN rotation and instead recommending that Plaintiff be dismissed from the College of Medicine. Defendants failed to permit Plaintiff to confront the witnesses against him or to address any of evidence presented against him, including false information presented to the UEC that

Plaintiff acted unprofessionally as a Teaching Assistant. *Id., para. 24*.

And in an extremely egregious and outrageous act, Dr. Kehl contacted Plantiff's preceptor who gave Plaintiff a passing grade in the rotation and insisted that he change Plaintiff's grade and fail Plaintiff on the OBGYN rotation. Dr. Gratkins refused to do so and maintained that Plaintiff successfully passed all aspects of the rotation and that no professionalism violation occurred. Yet, Defendants arbitrarily maintained that Plaintiff failed his rotation due to plagiarism and unprofessional conduct despite the passing grades given to him by his preceptor. Defendants then arbitrarily recommended that Plaintiff be dismissed from the University based upon a false report of unprofessional behavior which occurred two years earlier despite the fact Plaintiff already received a sanction for his alleged academic misconduct, which was nowhere near as harsh as expulsion from the University. These actions were deliberately intended to hurt Plaintiff and destroy his medical career and caused Plaintiff to suffer and continue to suffer great mental and emotional harm, anguish, insecurity, self-revulsion, damage to his self-esteem, and self-worth, shame and humiliation, including but not limited to severe and clinical depression, anxiety, loss of sleep, loss of appetite, and gastrointestinal pain. Accordingly, Plaintiff has established all elements of his claims for intentional infliction of emotional distress and Defendants' motion to dismiss this claim should be denied.

## H. IN THE EVENT THAT THIS COURT IS INCLINED TO GRANT ANY PORTION OF DEFENDANTS' MOTION, PLAINTIFF REQUESTS LEAVE TO AMEND HIS COMPLAINT.

While Fed. R. Civ. P. 15 places leave to amend within the sound discretion of the trial court, a court must remain guided by "the underlying purpose of Rule 15 . . . to facilitate decision on the merits, rather than on the pleadings or technicalities." *see **Conley v. Gibson***, 355 U.S. 41, 48, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).

Where there is there is an absence of bad faith, undue delay, dilatory motives or prejudice to the non-moving party and the proposed amendment is not futile, leave should generally be granted. ***Stanard v. Nygren***, 658 F.3d 792, 80 Fed.R.Serv.3d 1082 (7th Cir., 2011). Leave to amend should be liberally granted and the Seventh Circuit Court of Appeals has found that the trial court abused its discretion particularly when it could not be said to a certainty that the plaintiff

cannot state a claim upon which relief can be granted. *See Rohler v. TRW, Inc.*, 576 F.2d 1260 (C.A.7 (Ind.), 1978).

The factual history of the events giving rise to this litigation are extensive. In the event that this Court were to find any of Plaintiff's causes of action insufficient, leave to amend is requested.

## III.

## CONCLUSION

Having established that Plaintiff's Complaint is sufficiently plead, and that each cause of action sufficiently states a claim for which relief may be granted, Plaintiff prays that this Court will deny Defendants' Motion to Dismiss in its entirety.

DATED this 7th day of February, 2013.

THE BACH LAW FIRM, LLC


By:___*/s/ Jason J. Bach, Esq.*_____
    JASON J. BACH, ESQ.
    6053 S. Fort Apache Road, Suite 130
    Las Vegas, NV 89148
    *Attorney for Plaintiff*

THE BLAKE HORWITZ LAW FIRM, LTD


By:___*/s/ Blake Horwitz, Esq.*_____
    BLAKE HORWITZ, ESQ.
    39 South LaSalle St., Suite 1515
    Chicago, IL 60603
    *Attorney for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

Jason J. Bach, an attorney, certifies that on January 22, 2013, he electronically filed the above OPPOSITION TO DEFENDANTS' 12(b)(6) MOTION TO DISMISS PLAINTIFF'S COMPLAINT AND MEMORANDUM IN SUPPORT THEREOF with the Clerk of the Court by using the CM/ECF system, which sent notification of such filing to all parties of record.

/s/ Jason J. Bach
*Attorney for Plaintiff*
